## LESSER FRIEDBERG

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa November 10, 1881—Rehearing denied March Term, 1882.*

1. CRIMINAL LAW—*receiving stolen goods—evidence.* In this case, upon an indictment for receiving stolen goods for gain, knowing them to have been stolen, the evidence, which is reviewed in detail, was considered sufficient to support a conviction.

2. WITNESS—*accomplice.* While it is true that a jury should receive the testimony of an accomplice with caution, yet, if they think him worthy of belief in view of all the circumstances, they may convict upon his evidence, even without corroboration.

3. INSTRUCTION—*repeating.* There is no error in refusing instructions, the substance of which is contained in others given.

4. NEW TRIAL—*newly discovered evidence.* A new trial will not be granted for newly discovered evidence, in its nature merely impeaching evidence.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. THOMAS A. MORAN, Judge, presiding.

Mr. EMERY A. STORRS, for the plaintiff in error.

Mr. LUTHER LAFLIN MILLS, State's Attorney, for the People.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the Court:

This was an indictment against Lesser Friedberg, in the Criminal Court of Cook county. The indictment contained five counts. In the first count the defendant was charged with stealing, taking, and carrying away a certain quantity of goods, described in the indictment. In the second count it was charged that he burglariously stole, took, and carried away the goods. In the third count it was alleged that he aided in stealing the goods that had been stolen. Fourth, that he received the goods, knowing them to have been stolen. Fifth, that he purchased the goods, knowing them to have

been stolen. At the January term of the Criminal Court a trial was had, and the jury found the defendant guilty, as charged in the third, fourth and fifth counts of the indictment. The property was found to be of the value of $2000, and the term of imprisonment was fixed at four years in the penitentiary.

It is urged, as a ground of reversal of the judgment, that the verdict was based entirely and exclusively upon the testimony of one witness, George Freeman, one of the parties engaged in the commission of the burglary, whose evidence is unreliable, because he is a person of infamous and depraved character, and unworthy of belief. It is true that Freeman, who was one of the witnesses, had been convicted of a number of crimes, and had been punished by confinement in different State prisons, but we do not understand that the verdict rests entirely on his evidence.

On the night of October 4, 1878, the store of E. S. Joffray & Co., in Chicago, was entered by burglars, and a large quantity of goods, consisting of silks and silk handkerchiefs, was stolen and carried off by those who entered the store. This fact was established beyond controversy. It was also proven, beyond a doubt, that the stolen goods were taken in a wagon by the burglars and carried to the store of the defendant, a pawnbroker on State street, and while the burglars were removing the goods from the wagon into the defendant's store, between ten and eleven o'clock at night, they were discovered by a police officer, who came up to the wagon in the discharge of his duty as a policeman, and was shot and killed by one of the burglars, who at the time was on the wagon. Before the officer came up, a large quantity of the goods had been carried into the store, the defendant being present. It was also proven by two witnesses, Ida Morrison and Belle McCabe, who resided two blocks from defendant's pawn-shop, that one or two nights before October 4th they were in defendant's place, looked at some silk, and

11—102 ILL.

remarked that they did not wish to pay more than $1.50 per yard, when Friedberg said, come in to-morrow or next day night, when he would have some more,—he expected some more silk. Immediately after the occurrence in front of the store, captain of police O'Donnell testified, defendant's door was locked, the light in the store was nearly extinguished, and the defendant was not to be found about the premises. The witness went to Twenty-third street, looking for defendant, came back in a short time, gained admittance to the store, arrested Mrs. Harvey, whom he found in the building, and as he was in the act of leaving with her, defendant came up and denied that he was in the store when the officer was shot, and made other false statements in regard to his whereabouts.

These facts were established by evidence which seems to be reliable, and were proven independent of the testimony of Freeman, who was one of the burglars. In the argument of counsel for defendant these facts seem to be overlooked or ignored. Were they entitled to no consideration by the jury? The answer to this depends upon what may be regarded as established by these facts. This evidence proved the burglary. It proved that the stolen goods were immediately carried to the defendant and placed in his store, and that soon after the burglary had been committed the stolen property was found in the defendant's possession. Now, if at the time the stolen goods were received by defendant he knew they had been stolen, and he received them for his own gain, or to prevent the owner from again possessing his property, then the evidence would justify a verdict of guilty, without the evidence of Freeman, the accomplice.

In regard to the guilty knowledge of the defendant, it is proper to take into consideration the circumstances under which the goods were brought to the defendant's place and received by him. Had the goods been taken to the defendant in the day time, by a regular dealer in such goods, and sold

for a fair valuation, the transaction could not be regarded as suspicious. But such was not the case. The property was taken to defendant at an unusual hour of the night,—between ten and eleven o'clock. The goods were taken in a wagon, in a confused condition,—fine silks tied up in bundles with silk handkerchiefs. The parties in possession of the goods were all strangers to defendant, except Freeman, whom he knew to be a thief. These were the circumstances under which the goods were received by the defendant, and they were, in our judgment, sufficient to convince any man of ordinary honesty that the goods had been stolen. The theory that $2000 worth of fine silks would be thrown in a one-horse wagon in a confused condition, and hauled around a city for sale between ten and eleven o'clock at night, by any person who owned such goods, or who had obtained the possession honestly, is too preposterous to be entertained for a moment.

Again, it was proven by one of the defendant's own witnesses, that a short time before the goods were brought to the defendant's store, Freeman was there in consultation with the defendant. What was said between the two was not proven, but the fact that Freeman returned in a short time in company with his confederates, and commenced unloading the goods, leads to the presumption that the goods were brought there in pursuance of a previous understanding between the defendant and the burglars. The conduct, too, of the defendant immediately after the officer discovered the burglars unloading the goods, is a strong circumstance against him. The fact that he locked the store, denied that he was there, left the premises, and made contradictory statements in relation to what had occurred, all point to his guilt.

The statement of the defendant to the witness Morrison to come back in a night or two, that he would have more silks, has an important bearing in connection with the other facts. Where did he expect to get more silks? He did not show that he expected to buy them, or how he expected to get them.

Is it not reasonable to believe, in view of what subsequently occurred, that he was anticipating silks from the store of Joffray & Co.? But however that may be, when the testimony we have referred to is properly weighed and considered, the position that the verdict was based entirely upon the evidence of Freeman, is a clear misapprehension of the facts contained in the record.

Freeman, in his evidence, in substance says he assisted in robbing the store, and went with the goods to the defendant's place in pursuance of a prior arrangement made between him and the defendant. If the evidence of this witness is entitled to any consideration, there can be no doubt in regard to the guilt of defendant. Freeman was an accomplice, it is true, but that fact did not exclude him from testifying in the case,— it would only go to his credibility. It was for the jury to determine whether the witness was worthy of belief. It is true, a jury should receive the evidence of an accomplice with caution, but if they think him worthy of belief, in view of all the circumstances, they may convict upon his evidence, although it might not be corroborated. *Gray* v. *The People,* 26 Ill. 344; *Earll* v. *The People,* 73 id. 329. In this case, however, the jury did not have to rely entirely upon the evidence of the accomplice, as we have heretofore shown there is much evidence in the record tending to prove defendant's guilt, aside from the evidence of Freeman.

It is next urged that the court erred in refusing defendant's instructions one, two, three and four. The substance of refused instruction number one, was given to the jury in defendant's instruction number ten, and the court was under no obligation to repeat the same thing in different instructions. The second and third instructions were in conflict with the rule of law declared in *Gray* v. *The People,* 26 Ill. 344, and *Earll* v. *The People,* 73 id. 329, and upon this ground were properly refused. As to defendant's fourth refused instruction, its substance was given to the jury in

numbers four and five of defendant's instructions. At defendant's request the court gave to the jury twenty-four instructions, which fully and fairly presented to the jury all the law involved in the case, and so far as instructions are concerned, defendant has no just ground of complaint.

Upon the motion for a new trial certain affidavits were read showing newly discovered evidence, but the newly discovered testimony was in the nature of impeaching evidence, which, under the uniform decisions of this court, is no ground for a new trial. Sec. 239, Rev. Stat. 1874, p. 338, declares: "Every person who, for his own gain, or to prevent the owner from again possessing his property, shall buy, receive, or aid in concealing stolen goods  * * *  or property obtained by robbery or burglary, knowing the same to have been so obtained, shall be imprisoned in the penitentiary," etc. It is difficult to perceive how any fair-minded jury could hear all the evidence contained in this record, and arrive at any other conclusion than that the defendant received the goods in question for his own gain, knowing that they had been obtained by burglary. When the goods came to the defendant's place in the night time, in the possession of suspicious characters, one of whom he knew to be a professional thief, the articles tied up in suspicious bundles, it was his duty, as an honest man, to refuse absolutely to have anything to do with the goods. This, however, he failed to do. It is said that the defendant made objection to the goods being brought into his store. There was some evidence of this character before the jury, but it is apparent, when the testimony is closely examined, that no objection was made by the defendant until he saw that a policeman had discovered the burglars unloading the goods at his place. Of course he would then object, but the objection comes too late to be of any service in his defence.

We perceive no error in the record, and the judgment will be affirmed.                 *Judgment affirmed.*

Mr. JUSTICE DICKEY, dissenting:

I can not divest myself of the conviction that the verdict and judgment in this case are both wrong. Without questioning that the uncorroborated testimony of an accomplice in crime may in some cases be sufficient to convict, I deem it a very unsafe and dangerous precedent to sustain a conviction resting upon the testimony of such a witness, who shows himself so deeply steeped in crime, whose story, in many of its phases, is so improbable upon its face, and where he is directly contradicted in the vital parts of his testimony by the testimony of at least two witnesses against whose character or credibility nothing appears, and where such powerful motives to induce the accomplice to speak falsely are apparent from the nature of the case.

Freeman testifies to a previous arrangement with Friedberg that he would receive these goods when stolen. He says this was done openly, in presence and hearing of Friedberg's wife, and in the presence of Harvey, a man he had never seen or heard of before. In this he is flatly contradicted by Harvey, who is shown to be a respectable and industrious mechanic, and by this record stands unblemished, save by the testimony of this same man, by his own confession a professional thief.

The story of Freeman as to what occurred at this time, so far as relates to the lending of a revolver, is proven false by the witness Levi, who stands unimpeached upon this record. Freeman testifies that the accused did consent to receive, and did willingly receive, the goods on the night of the 4th of October, which is the offence charged in this case. Right here is the *gist* of the controversy. In this he is flatly contradicted by the oath of the prisoner, and by the testimony of Harvey, who was present, and by that of Harvey's wife, and by circumstances sworn to by the witness Weiser. The theory of Freeman's story is, that Friedberg and his wife were coöperating in what was done, and the statement that the Friedbergs were consenting to take the custody of the goods

Mr. Justice DICKEY, dissenting.

in question is shown to be false by the testimony of William
Weiser, who stands unimpeached, and which shows that so
far from receiving the goods, Friedberg (before the presence
of any officer was apprehended) ordered Freeman, who was
bringing the goods into his store, "to take the goods out,"
and that to enforce the demand that the goods should be
taken away, Mrs. Friedberg sent the witness hastily for an
officer, saying, "go as quick as you can;" that the witness
went immediately and found officer Race; that Race at once
started for the store; that Mrs. Friedberg, who had mean-
while followed witness when he went for the officer, met officer
Race on his way to the scene and spoke to him, and Race
hastened to the store door, and was there instantly shot and
killed. This killing was plainly done either by Freeman in
person, or some one of his fellows who were seeking to place
the goods in Friedberg's store. There is absolutely no evi-
dence tending to sustain the charge that Friedberg *received*
these goods, or took the custody of them, except that of Free-
man.

It is suggested that the fact that these goods were brought
at so late an hour should have indicated to Friedberg that
they were probably stolen. This may be so; but it must be
remembered that the testimony is that at first Freeman came
alone, and simply said he had some silk handkerchiefs he
wanted to sell, and Friedberg consented merely to look at
them. The surroundings were so suspicious that Harvey
advised Friedberg to have nothing to do with them, and
Friedberg, having his suspicions aroused, replied, it "could
do no harm to look at them," and that "he did not intend to
buy." When the man returned, not merely with some hand-
kerchiefs, but with a wagon and large quantity of other goods,
and began to bring them in, Friedberg protested and forbid.
All this is well shown by testimony apparently credible, and
is nowhere contradicted, save by Freeman's very improbable
story.

It is suggested the testimony of the girls, Ida Morrison and Belle McCabe, corroborates Freeman, wherein they say that a day or two before this occurrence they were at Friedberg's store looking at some silks, with a view of buying, and said they were not such as they wanted, and that Friedberg requested them to call again soon, as he expected to have other and better silks in a day or so. Saying nothing about the apparent character of these girls, and taking this as honest testimony, it seems to me a matter of no significance. A man keeping a store and pawn-shop, or an auction store, in a large city, is daily receiving goods of almost every character, and is liable to have such goods any day from legitimate sources, in the ordinary course of business. It seems nothing more than the usual request of dealers to customers to call again, with the not unusual suggestion that they may shortly have such articles as are called for. It was a casual remark, and the lightest kind of testimony. It can not be said to be a substantial corroboration of Freeman.

Freeman's motive to swear falsely against the Friedbergs is palpable. It appears from the affidavits in support of the motion for a new trial, that on the trial of Lamb for the murder of Race (where Freeman testified against Lamb), Mrs. Friedberg was a witness, and testified that it was Freeman who shot Race. Freeman, in this controversy, is testifying to save his own life, and to destroy the standing of those who aver his own guilt. He is not merely an uncorroborated accomplice, but he is, by his own account, a professional thief and burglar, steeped in crime, swearing under strong motives to speak falsely, and contradicted by several unimpeached witnesses. The good of society does not, in my judgment, demand that any man shall be convicted of crime upon such proof, only.

Mr. JUSTICE WALKER: I concur with my brother DICKEY in his dissenting opinion.